IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| GERGANA IVANOVA, § | |
| § | |
| Plaintiff § | |
| § | |
| v.   § | Civil Action No. 3:09-CV-2349-K (BH) |
| § | |
| MICHAEL J. ASTRUE, § | |
| Commissioner of Social Security, § | |
| § | |
| Defendant.   § | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Pursuant to *Special Order No. 3-251*, this case was automatically referred for proposed findings of fact and recommendation for disposition. Before the Court are *Plaintiff's Motion for Summary Judgment* (doc. 18), filed April 5, 2010, and *Defendant's Motion for Summary Judgment* (doc. 19), filed April 27, 2010. Based on the relevant filings, evidence, and applicable law, Plaintiff's motion should be **GRANTED**, Defendant's motion should be **DENIED**, and the case should be remanded to the Commissioner for further proceedings.

## I. BACKGROUND[1]

### A. Procedural History

Gergana Velikova Ivanova ("Plaintiff") seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying her claims for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 423. She applied for the benefits on June 25, 2004, claiming that she had been disabled since February 11, 2004, due to an injury to her head and neck. (Tr. at 78-80, 105). The Commissioner denied Plaintiff's application initially and upon

---

[1] The background information comes from the transcript of the administrative proceedings, which is designated as "Tr."

reconsideration. (Tr. at 29, 30). She timely requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 42). On July 15, 2005, Plaintiff appeared *pro se* and testified at a hearing before the ALJ. (Tr. at 245-55). On October 26, 2005, Plaintiff appeared *pro se* at a second hearing before the ALJ. (Tr. at 256-70). On April 22, 2006, the ALJ issued a written decision finding Plaintiff not disabled. (Tr. at 236-40). On August 8, 2006, upon Plaintiff's request, the Appeals Council vacated the decision and remanded the case with specific directives to the ALJ for further administrative proceedings. (Tr. at 26-28).

On April 24, 2007, the ALJ issued another decision, finding Plaintiff not disabled. (Tr. at 242-43). On June 20, 2008, the Appeals Council vacated the decision and remanded the case for a new hearing and decision, and for Plaintiff to submit additional evidence. (Tr. at 242). The council reasoned that it could not locate the administrative record upon which the ALJ had based his decision, and therefore could not determine whether the decision was supported by substantial evidence. *Id.*

On October 17, 2008, Plaintiff appeared *pro se* at another hearing before the ALJ. (Tr. at 271-78). On June 11, 2009, the ALJ issued another decision finding Plaintiff not disabled. (Tr. at 13-19). The Appeals Council denied Plaintiff's request for review, and the ALJ's decision became the final decision of the Commissioner. (Tr. at 7-10). On December 10, 2009, Plaintiff timely appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. § 405(g).

**B. Factual History**

    **1. Age, Education, and Work Experience**

Plaintiff was born on March 19, 1962. (Tr. at 78). Her preferred language is Bulgarian, and

she cannot speak or understand English, or write more than her name in English. (Tr. at 104). Her past relevant work experience includes positions as a house-keeper, cable assembler, cell-phone repairer, and small business owner. (Tr. at 94).

### 2. Medical Evidence

Plaintiff's medical record shows that on February 1, 2004, she suffered a work-related injury when a pile of trash fell on her head. (Tr. at 91, 159, 175). Two days later, Baxter Greer, D.O., a treating doctor, and Aaron Horton, a rendering doctor, examined her. (Tr. at 159-161). She reported "constant moderate shooting and throbbing pain" in her left forehead area and anterior cranium, and sharp, throbbing, and stabbing pain shooting into the posterior cervical area, sub-occipital regions, posterior upper shoulder, and occipital area. (Tr. at 159). The doctors noted a possibility of nerve root impingement and diagnosed her with cervical disc displacement and herniation; injury to cervical nerve root; neuralgia, neuritis, and radiculitis; myofascitis; and headache. (Tr. at 160-61). Plaintiff received electrical muscle stimulation, muscular therapeutic massage, and manual therapy to the affected areas. (Tr. at 161). Dr. Greer treated Plaintiff up to July 2004, and administered physical therapy, massage with electrodes, and pain medication. (Tr. at 107).

In March 2004, Dr. Greer referred Plaintiff to J.B. Brock, D.C., for an electrodiagnostic and neurological consultation. (Tr. at 165). Dr. Brock observed a limited cervical range of motion, and noted palpable tenderness in the cervical paravertebral region. (Tr. at 166). He found a normal electrodiagnostic study, but did not rule out intervertebral disc disruption or underlying degenerative changes. (Tr. at 167). He recommended an MRI of the cervical spine if the symptoms continued. *Id.* A cervical MRI showed a relatively large disc protrusion at the C5-6 level, a midline disc protrusion at C6-7, and straightening of the normal cervical lordosis. (Tr. at 163, 175-78).

On March 18, 2004, Plaintiff underwent a functional capacity examination by Lauren Evans D.C., at the request of Texas Worker's Compensation Commission. (Tr. at 170). Testing revealed a reduced range of motion, weakness in the area of injury, and weakness in her hand and pinch grip. (Tr. at 172-73). Dr. Evans opined that Plaintiff could only lift safely in the sedentary category and recommended that she be restricted from heavy lifting. (Tr. at 173). Since observation testing revealed pain and tenderness, Dr. Evans opined that reaching, stooping, crouching, and crawling were not safe for Plaintiff. *Id.* She recommended that Plaintiff's daily activities be limited. *Id.*

On March 22, 2004, Dr. Greer referred Plaintiff to Francisco Battle, M.D., a neurosurgeon. (Tr. at 153, 175). Dr. Battle reported no significant improvement in her symptomology even after therapy, observed a decreased range of motion secondary to her pain, and after reviewing her MRI, diagnosed her with cervical radiculopathy, herniated nucleus pulposus at C5-6, and cervicalgia. (Tr. at 175, 177). He recommended surgery in the form of anterior cervical disectomy and fusion at C5-6 with placement of an anterior cervical plate, and reported that Plaintiff had agreed to and would be scheduled for the recommended surgery. (Tr. at 177-78). Plaintiff's Worker's Compensation insurance carrier refused to acknowledge her cervical spine injury as compensable. (*See* Tr. at 90-93). Dr. Greer sent Plaintiff back to work, restricting her to a maximum of two hours of pushing and pulling, and no overhead reaching, or lifting or carrying objects of more than 15 pounds. (Tr. at 157-58).

On August 16, 2004, Frederick Cremona, M.D., a state agency consultant, issued a physical Residual Functional Capacity ("RFC") assessment. (Tr. at 194-201). He listed cervical radiculopathy as the primary diagnosis and herniated nucleus pulposus at C5-6 as the secondary diagnosis. (Tr. at 194). He opined that Plaintiff could lift and carry 50 pounds occasionally; carry

4

25 pounds frequently; and sit, stand or walk for 6 hours in an 8-hour work day. (Tr. at 195). He placed no limitations on pushing or pulling, and identified no manipulative or postural limitations. (Tr. at 195-97).

From July 2004 to July 2005, Plaintiff saw Pierre Herding, M.D. (*See* Tr. at 186-93, 202-04). Medical records covering the period from September 2004 to July 2005, show that Dr. Herding consistently diagnosed Plaintiff with cervical disc displacement and herniation; cervicalgia; neuralgia, neuritis, and radiculitis; and post-concussion syndrome; and restricted her from all work a number of times. (Tr. at 152, 202-04). In September 2004, upon Plaintiff's request for a stronger analgesic, Dr. Herding prescribed her hydrocodone instead of the ibuprofen previously prescribed by Dr. Greer. (Tr. at 114, 191). He also substituted her Ambien prescription with Restoril. (Tr. at 190). Since Plaintiff was "adamantly opposed" to any surgical procedures to relieve her symptoms, Dr. Herding began physical medicine treatments three times a week. (Tr. at 188, 191). Plaintiff responded well to the medication regimen, and Dr. Herding decided to continue it. (Tr. at 189). In a letter dated October 19, 2004, Dr. Herding stated that Plaintiff suffered from a disc herniation and would be disabled for at least 18 months. (Tr. at 187). In another letter dated December 6, 2004, and addressed to the Worker's Compensation Commission, Dr. Herding wrote that Plaintiff's cervical disc herniation resulted in significant pain interfering with her ability to sleep, and that Plaintiff's insurance had refused to honor her prescription for sedatives even though her sleep disturbance was a direct consequence of her work-related injury. (Tr. at 186).

On December 20, 2004, Antonio Guerra-Watson, Ph.D., conducted a mental examination of Plaintiff. (Tr. at 205-12). After interviewing Plaintiff and her husband, Dr. Guerra-Watson reported that Plaintiff had experienced a decline in her functioning in the last eleven months with

an increase in pain and depressive symptoms. (Tr. at 211). He diagnosed her with "major depressive disorder, single episode, moderate," and assigned her a GAF Score[2] of 55. *Id.*

Based on Dr. Guerra-Watson's mental evaluation, Norvin Curtis, Ph.D., a state agency consultant, completed a Psychiatric Review Technique on December 31, 2004. (Tr. at 214-24). Dr. Curtis indicated that Plaintiff's "major depressive disorder, single episode, moderate" was characterized by appetite disturbance with change in weight, sleep disturbance, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking. (Tr. at 217). Dr. Curtis also indicated that she was mildly restricted in activities of daily living, and had moderate difficulties in maintaining social functioning, and in maintaining concentration, persistence or pace. (Tr. at 224). Dr. Curtis also completed a mental RFC assessment on the same day (Tr. at 228-31), and opined that "Plaintiff could understand, remember and carry out detailed but not complex instruction[s], make decisions, concentrate for extended periods, accept instructions, and respond appropriately to changes in [a] work setting"(Tr. at 230).

3. **Hearing Testimony**

The administrative record shows that Plaintiff personally appeared at three hearings before the ALJ, accompanied by her husband. (Tr. at 245-277).

*a. Hearing One*

At the first hearing held on July 15, 2005, Plaintiff was not represented by an attorney. (Tr. at 245-47). The hearing lasted eleven minutes. (Tr, at 247, 255). Mr. Ivanov explained that he and his wife did not understand English well and had requested but not received an interpreter. (Tr. at

---

[2] GAF stands for Global Assessment of Functioning. A GAF rating of 51-60 indicates a "moderate" impairment in social, occupational, or school functioning. *See* Am. Psychiatric Ass'n: Diagnostic & Statistical Manual of Mental Disorders ("DSM-IV-TR")32 (4th ed. 2000).

6

248-49). The following exchange ensued about Plaintiff's right to representation:

| | |
|---|---|
| ALJ: | I need to tell you, do you know you have a right to a representative? A right to an attorney. |
| Mr. Ivanov: | Yeah, but -- |
| ALJ: | Okay. Well, you don't have to do it. I'm just, I am required under my procedures manual to talk to you about that -- |
| Mr. Ivanov: | Um-hum |
| ALJ: | -- that you have a right to a representative. I'm going to postpone it now anyways, but during this postponement, I want you to consider representation because I'm going to talk to you when I get the translator. |
| Mr. Ivanov: | Yeah |
| ALJ: | -- I'm going to talk to you about getting representation and at that time I will once again say, you know, for you. A representative will meet with you ahead of time and tell you what this hearing is going to be all about and a representative can sometimes point me to things in the file to shorten the hearing so I can pay your benefits without going through a full hearing. So there are benefits to a representative and I'm going to make a notation that I'm going to explain them to you again with the translator present and at that time once again, you'll have an opportunity to seek a postponement. |
| Mr. Ivanov: | Um-hum |
| ALJ: | . . . please consider whether you want to get a lawyer, or a representative. Do you understand what I mean? I'm not asking you to decide yes or no now. I'm just telling you when you come back and I have a translator here, I'm going to go through that again and if you think you're going to get a lawyer to help you, why don't you do it now and get one because if you decide to get a lawyer then, I'm going to have to postpone that again and which will make it take long. That's all I'm trying to tell you. |

(Tr. at 250-52). Mr. Ivanov then asked the ALJ whether based on Plaintiff's file, she would get

social security benefits, and the following conversation occurred:

| | |
|---|---|
| ALJ: | I would say that under social security law, you're not disabled and I would say no. |
| Mr. Ivanov: | Okay |
| ALJ: | So I want to give you a better chance to get a translator. You can get a representative who can get more paperwork for you, more documents. |
| Mr. Ivanov: | Um-hum. |
| ALJ: | -- if you get a representative. I just want you to think about all that. |

7

(Tr. at 253-54).

> Mr. Ivanov:   Now we only want to ask for the translator.
> ALJ:   Yeah, we're going to have a translator. We are going to have one, so I want you to think about getting an attorney, a representative. You know what I mean by that?
> Mr. Ivanov:   Yeah.
> ALJ:   you have a right -- I want you to think about it. You don't have to answer me now one way or the other, but when you come back, I am going to put that question squarely to you, and if you decide then maybe it might be a good idea to get one, I will have to postpone it again. I don't want that to happen. That's why I'm bringing it up now. I don't want to have to postpone it -- I have to postpone it now because I need a translator for Bulgarian. Okay? we'll be adjourned then, but talk about that.

(Tr. at 254-55).

### b. *Hearing Two*

At the second hearing, which lasted thirty-nine minutes, Plaintiff was again unrepresented by an attorney but had a Bulgarian interpreter. (Tr. at 258, 270). The conversation regarding Plaintiff's right to representation consisted of the following statements:

> ALJ:   . . . But first let me make sure that you understand you have a right to have a representative help you. Do you understand that you have a right to have a representative help you?
> Plaintiff:   Yes.
> ALJ:   And you want to proceed without the help of a representative?
> Plaintiff:   I think I have the necessary documents.
> ALJ:   okay. . .

(Tr. at 258). After Plaintiff started testifying, the ALJ interjected again:

> ALJ:   And you're sure you don't want a representative because a representative can help you get documents, they can explain what the issues are, they can prepare you for the hearing? I don't want to proceed if you want a rep.
> Plaintiff:   But I was working, I paid my doctors and after this injury happened to me, what am I supposed to do?
> ALJ:   Okay. Well, we'll proceed then without a representative if you're

8

>    sure you don't want one.

(Tr. at 260).

Plaintiff testified that she lived in a house with her husband and three children aged 18, 20, and 24. (Tr. at 260-61). One of her children stayed home with her, another one worked less than 40 hours a week and a third one went to school. (Tr. at 261). He husband worked shifts during the day and night. *Id.* She did household work with the help of her husband and children, and went grocery shopping with her husband. (Tr. at 265-66). She only drove small distances. (Tr. at 267). Plaintiff testified that her pain was remittent. (Tr. at 268). She took Hydrocodone and another sleeping pill to help with her sleep. (Tr. at 266). She felt better with medication but sometimes felt dizzy. (Tr. at 267). Plaintiff stated that she did not know English at all and only knew a few words that she had learnt for her housekeeping job. (Tr. at 264). Mr. Ivanov testified that Plaintiff could not sit in one place for a long period of time and was having difficulty learning English because of her memory problems. (Tr. at 269).

### c. Hearing Three

At the third hearing, which was fourteen minutes long, Plaintiff was again not represented by an attorney, but had an interpreter. (Tr. at 273, 278). The conversation regarding Plaintiff's right to representation comprised of the following statements:

>    ALJ:        At this time and understanding that I have explained this to you before, would you like to postpone to seek representation?
>    Plaintiff   No.
>    ALJ:        So you are waiving your right to representation?
>    Plaintiff:  Yes.
>    ALJ:        Okay. Well, that's good then. We'll go forward.

(Tr. at 274). Plaintiff testified that she wanted to commit suicide. (*See* Tr. at 276-77). The ALJ asked if Plaintiff had seen a doctor for her suicidal ideations, and Plaintiff responded that she didn't

have the money to see a doctor.  He then told her and her husband to feel free to say anything and then promptly adjourned the hearing.  (Tr. at 275-77).

## C. ALJ's Findings

The ALJ denied Plaintiff's application for benefits by written opinion issued on June 11, 2009. (Tr. at 13-19).  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since February 11, 2008, the alleged date of onset of disability, through December 31, 2008, her date last insured.  (Tr. at 15, ¶2).  At step two, he found that Plaintiff's degenerative disc disease of the cervical spine was a severe impairment.  (Tr. at 15, ¶3).  At step three, he found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment listed in the social security regulations.  (Tr. at 17, ¶4).  At step four, he found that Plaintiff maintained the residual functional capacity ("RFC") to lift and carry 20 pounds occasionally, 10 pounds frequently, sit, with normal breaks, for up to 8 hours of an 8 hour work day, and stand or walk for up to 6 hours of an 8 hour workday.  (Tr. at 17, ¶5).  At step five, the ALJ found that Plaintiff was capable of performing past relevant work as a cable assembler and cell phone repairer.  (Tr. at 19, ¶6).  Accordingly, the ALJ concluded that Plaintiff was not under a disability as defined in the Social Security Act at any time from her alleged onset date through the date last insured.  (Tr. at 19, ¶7).

## II. ANALYSIS

### A. Legal Standards

#### 1. Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper

10

legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(c)(3). "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

### 2. Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64. The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony*, 954 F.2d at 292.

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

      3.      An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

      4.      If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

      5.      If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at Step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

## B. Issues for Review

Plaintiff presents the following issues for review:

    (1)    Under the relevant laws and regulations, the Commissioner's decision can be affirmed only if it is supported by substantial evidence. Does his decision

    satisfy this standard?[3]

(2) To ensure a valid waiver of counsel, the ALJ must notify the claimant of how an attorney can aid in the proceedings, the possibility of a contingency fee arrangement, and the limitation on fees. Did the ALJ fail his duty when he neglected to inform the claimant of the financial aspects of obtaining a counsel?

(3) When an ALJ receives an Appeals Council remand order with directives, he is legally bound to follow the specific mandates of the Council. Did the ALJ violate the Council's order when he failed to address the specific mandates and merely reasserted his previous findings vacated by the Council?

(P. Br. at 1-2).

## C. Issue Two: Waiver of Counsel

Plaintiff contends that the case should be reversed and remanded because her right to representation of counsel was infringed by an invalid waiver of counsel. (P. Br. at 14-21).

There is no constitutional right to counsel at a social security hearing. *See Brandyburg v. Sullivan*, 959 F.2d 555, 562 (5th Cir. 1992). A social security claimant, however, has a statutory right to counsel at such a hearing. 42 U.S.C. § 406; *Castillo v. Barnhart*, 325 F.3d 550, 552 (5th Cir. 2003). In order to validly waive her right to counsel, a social security claimant must receive adequate notice of the scope of that right. *Brock v. Chater*, 84 F.3d 726, 729 n.1 (5th Cir. 1996). A claimant receives adequate notice if she is given sufficient information "to decide intelligently whether to retain counsel or proceed pro se." *Norden v. Barnhart*, 77 F.App'x 221, 223 (5th Cir. 2003)(citing *Clark v. Schweiker*, 652 F.2d 399, 403-04 (5th Cir. 1981)). "'Sufficient information'

---

[3]Although expressly listed, the issue is not addressed in Plaintiff's opening brief beyond a general statement of the standard of review. (*See* P. Br. at 1, 14). It is addressed for the first time in Plaintiff's reply brief. (Reply Br. at 5, 9). Because Plaintiff has deprived Defendant of a meaningful opportunity to respond to the issue, it is not considered. *See Spring Industries, Inc. v. American Motorists Ins. Co.*, 137 F.R.D. 238, 239 (N.D. Tex. 1991) (Fitzwater, J.) (noting practice of declining to consider arguments raised for the first time in a reply brief because nonmovant should be given a fair opportunity to respond to the motion) (citing *Senior Unsecured Creditors' Comm. of First RepublicBank Corp. v. FDIC*, 749 F. Supp. 758, 772 (N.D. Tex. 1990)).

includes explanations of the possibility of free counsel, a contingency agreement, and the limitation on attorney's fees to 25% of past due benefits awarded." *Id.* An ALJ should provide pre-hearing written notification of a claimant's right to counsel, and also ascertain at the hearing whether the claimant had a "meaningful opportunity to secure counsel and, if not, consider adjourning the hearing to provide that opportunity." *See Freeman-Park v. Barnhart*, 435 F.Supp.2d 597, 601 (E.D. Tex. 2006). The fundamental issue for determination is whether the claimant "knowingly and intelligently" waived her right to counsel. *See Hussey v. Astrue*, 2009 WL 166666, at *7 (E.D. La. Jan. 20, 2009).

Here, the record includes four separate pre-hearing written notices sent to Plaintiff that advised her of her right to counsel. (Tr. at 21, 43-50, 54, 67). The notices were all in English, however. (Tr. at 252). Only one of the notices informed Plaintiff of the type of assistance an attorney could provide during the hearing, of the possibility that she could qualify for free representation, that some attorneys wouldn't charge fees until she received benefits, and that the social security office would withhold 25% of her past due benefits to pay toward her attorney fees. (*See* Tr. at 45-46).

The record also shows that the ALJ tried to inform Plaintiff of her right to representation at the three hearings before him. (Tr. at 250-55, 258, 260, 274). At the first hearing, no interpreter was present when the ALJ requested Plaintiff consider her right to representation. (Tr. at 250-55). At the second hearing, the ALJ informed Plaintiff through an interpreter that a representative could help her get documents, explain what the issues are, and prepare her for the hearing. (Tr. at 260). The ALJ did not inform Plaintiff of the possibility of free counsel, a contingency fee agreement, or the limitation on attorney's fees to 25% of past due benefits awarded. He then went forward with the

hearing without receiving a definitive answer as to whether Plaintiff wanted to proceed without representation. (Tr. at 258, 260). At the third hearing, the ALJ asked through an interpreter whether Plaintiff was waiving her right to representation. (Tr. at 274). Plaintiff responded in the affirmative and the ALJ decided to proceed with the hearing. *Id.* The ALJ again did not inform Plaintiff of the possibility of free counsel, a contingency fee agreement, or the limitation on attorney's fees to 25% of past due benefits awarded. Since the pre-hearing notifications were in English, and the ALJ was on notice that Plaintiff could not speak or understand English (*see* Tr. at 104, 248-49, 264), the ALJ should have inquired whether Plaintiff was aware of this information in the presence of the Bulgarian interpreter. *See Vega v. Schweiker*, 549 F. Supp. 713, 716 (D.C.N.Y. 1982) (written notification in English regarding right to representation of counsel was rendered immaterial by social security claimant's deficiency in English). The record does not reflect that Plaintiff received adequate notice of the scope of her right to representation or that her waiver was valid or knowingly or intelligently made.

A flawed or invalid waiver merits remand only if a claimant shows ensuant prejudice. *Brock*, 84 F.3d at 729 n.1 (citing *Kane v. Heckler*, 731 F.2d 1216, 1220 (5th Cir. 1984)). The claimant must show that counsel "could and would have adduced evidence that might have altered the result." *Id.* at 728; *see also Pullam v. Astrue*, 2008 WL 4000538, at *3 (W.D. La. July 1, 2008). Here, Plaintiff argues, among other things, that counsel could and would have ordered a new psychological evaluation of Plaintiff because her previous diagnosis of major depressive disorder by Dr. Guerra-Watson was four years old, and because she had indicated that her depressive symptoms had grown to a point of suicidal ideations. (P. Br. at 18). She argues that counsel would have made it plain to Plaintiff that her case would be much strengthened if she had an up-to-date psychological

15

examination by a professional of her choice. *See Clark*, 652 F.2d at 406 (applying same reasoning in the context of a physical examination). Additionally, a new psychological evaluation might have altered the result because in addition to relying on the new evaluation, the ALJ might have relied on Dr. Guerra-Watson's evaluation, which he simply dismissed in his opinion. Plaintiff has met her burden to show prejudice from her invalid waiver of counsel.

Since Plaintiff has shown prejudice from her invalid waiver of counsel, the Commissioner's decision should be reversed and the case should be remanded for further proceedings consistent with this decision. Since remand is required on this issue, the Court does not consider the remaining issue for review.

### III.  RECOMMENDATION

*Plaintiff's Motion for Summary Judgment* (doc. 18) should be **GRANTED**, the *Defendant's Motion for Summary Judgment* (doc. 19) should be **DENIED**, and the decision of the Commissioner should be **REVERSED** and the case **REMANDED** for further proceedings.

**SO RECOMMENDED**, **on this 20th day of May, 2010.**

_____
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

**INSTRUCTIONS FOR SERVICE AND**
**NOTICE OF RIGHT TO APPEAL/OBJECT**

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

_____
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE